
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 1 2 2018

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EVAN C. SEELEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 4:17-CV-1015-A |
| | § | |
| ELAINE L. CHAO, SECRETARY, | § | |
| U.S. DEPARTMENT OF | § | |
| TRANSPORTATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Came on for consideration the motion of defendant, Elaine L. Chao, Secretary, U.S. Department of Transportation, for summary judgment. The court, having considered the motion, the response of plaintiff, Evan C. Seeley, the reply, the record, and applicable authorities, finds that the motion should be granted.

I.

### Plaintiff's Claims

The operative pleading is plaintiff's first amended complaint filed January 5, 2018. Doc.[1] 6. Briefly, plaintiff alleges:

Plaintiff is an air traffic control specialist employed by the Federal Aviation Administration ("FAA") at the Fort Worth Enroute Traffic Control Center in Fort Worth, Texas. On or about April 11, 2014, he made a written request to use four hours of

---

[1] The "Doc. __" reference is to the number of the item on the docket in this action.

leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54 ("FMLA") every Friday and eight hours of FMLA leave every Saturday through November 2014, so that he could bond with his son born November 5, 2013. He also requested earlier shifts on Fridays to accommodate his familial responsibilities and offset the use of FMLA leave. Plaintiff was required to provide detailed documentation in support of his request that was not required of female co-workers who submitted similar requests, and he was not provided any assistance in filling out the forms to defendants' satisfaction.[2] Defendants delayed ruling on plaintiff's leave requests and ultimately denied them. On the date of the denial, plaintiff filed a grievance to complain of the seemingly endless delay in processing his requests for leave. Defendants requested three separate thirty-day extensions of time to respond to the grievance, but never ruled on it. Plaintiff elected to pursue other procedures available by making a complaint on June 9, 2014, with the EEOC. A letter of notice of right to sue was issued December 1, 2017.

Plaintiff seeks damages for discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). The court

---

[2] At the time, there were two defendants named.

has dismissed plaintiff's claim for whistleblower retaliation. Doc. 20.

II.

Ground of the Motion

Defendant maintains that plaintiff cannot establish the existence of an adverse employment action, which is a necessary element of his claims under Title VII.[3]

III.

Applicable Legal Standards

A. Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the

---

[3]The court notes that there appear to be other grounds that could have been raised. For example, it does not appear that plaintiff was similarly situated to any other comparator. See Doc. 35 at 292. Nor does it appear that plaintiff has evidence to overcome defendant's nondiscriminatory reasons for denying his initial leave requests.

nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 597 (1986). In Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, the Fifth Circuit explained:

> Where the record, including affidavits,
> interrogatories, admissions, and depositions could not,
> as a whole, lead a rational trier of fact to find for
> the nonmoving party, there is no issue for trial.

929 F.2d 1054, 1058 (5th Cir. 1991).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of

4

law.[4] Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597; see also Mississippi Prot. & Advocacy Sys., 929 F.2d at 1058.

B.  Title VII

To make out a prima facie case of sex discrimination, plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and, (4) he was treated less favorably than similarly-situated individuals of the other sex, or replaced by a member of that sex. Okoye v. Houston Health Science Center, 245 F.3d 507, 512-13 (5th Cir. 2001). An adverse employment action is an ultimate employment decision. Felton v. Polles, 315 F.3d 470, 486 (5th Cir. 2002). Ultimate employment decisions include hiring, firing, demoting, promoting, granting leave, and compensating. Thompson v. City of Waco, 764 F.3d 500, 503 (5th Cir. 2014). An employer's action does not rise to the level of adverse if it fails to have more than a tangential effect on a possible future ultimate employment decision. Mota v.

---

[4]In Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), the Fifth Circuit explained the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict.

5

Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 519 (5th Cir. 2001).

To state a claim for retaliation under Title VII, plaintiff must allege that he participated in an activity protected by Title VII, his employer took an adverse employment action against him, and a causal connection exists between the protected activity and the adverse employment action. McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007). Adverse action is that which produces injury or harm. Lopez v. Kempthorne, 684 F. Supp. 2d 827, 862 (S.D. Tex. 2010). "[P]etty slights, minor annoyances, and simple lack of good manners are not actionable retaliatory conduct." Id. at 863. And, for there to be a causal connection, the employer must know about the employee's protected activity. Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 883 (5th Cir. 2003).

To state a claim for hostile work environment, plaintiff must plead facts to show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his protected status; (4) the harassment affected a term, condition, or privilege of employment; and, (5) defendant knew or should have known about the harassment and failed to take remedial action. Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002). To be actionable, the harassment must

be both objectively and subjectively offensive. <u>Harvill v. Westward Communications, LLC</u>, 433 F.3d 428, 434 (5th Cir. 2005). Factors considered include the frequency of the conduct, its severity, whether the conduct was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. <u>Williams v. Innovate Loan Servicing Corp.</u>, No. 4:13-CV-994-A, 2015 WL 1402336, at *3 (N.D. Tex. Mar. 26, 2015). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in terms and conditions of employment." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

IV.

## Undisputed Facts

The Fort Worth Center ("ZFW") is an air traffic facility open 24 hours a day, 7 days a week, 365 days a year. The business and priority of the facility is the safety of the national airspace system. ZFW is divided into six areas of operations, each of which has at least one operations manager ("OM") and a frontline manager ("FLM") responsible for each crew. Each FLM has approximately 5-20 air traffic controllers ("ATCs") who report directly to the FLM. Generally, granting or denying leave is a function of the FLM, who must balance the needs of the FAA to ensure safety, requirements of policies and the collective

bargaining agreement[5] governing certain employees, and needs and desires of employees. If there is any question regarding the propriety of a leave request, the FLM may seek advice from the OM or facility manager. Doc. 35 at 298-99.

The collective bargaining agreement applicable here contains three provisions pertinent to childcare. Article 26, titled "Leave for Special Circumstances," provides in Section 5 that, in accordance with the FMLA, upon request, an employee is entitled to a total of twelve administrative work weeks of leave without pay during any twelve month period for the birth of a child and care of the newborn.[6] Doc. 35 at 43. Article 26, Section 7 provides that unless staffing and workload do not permit, employees shall be granted annual leave or leave without pay to care for members of their families where the employee is needed to aid or assist in the care of minor children whose care provider is temporarily unable to provide care. Id. at 44. And, Article 30, titled "Prenatal/Infant Care," provides that, subject to staffing and workload, employees are entitled to prenatal/infant care leave for up to nine months in addition to the leave entitlements in Article 26, Section 5. Id. at 46.

---

[5]Most non-managerial air traffic controllers, such as plaintiff, are represented by the National Air Traffic Controllers Association. Doc. 35 at 299.

[6]The FMLA provides that leave shall not be taken intermittently or on a reduced leave schedule unless the employee and employer agree otherwise. 29 U.S.C. § 2612(b)(1).

8

ATCs bid for their schedules each year. The bidding, done in order of seniority, starts with the ATCs first identifying what regular days off ("RDO") they want each week for the next calendar year. Fridays and Saturdays are the most popular RDOs. ATCs then bid on what shifts they prefer, e.g., mornings, afternoons, overnight. For the most part, ATCs assigned to work Friday evenings and Saturdays must seek "spot" leave on or near the time the leave is needed. It may be granted depending on the reason for the request and staffing needs.[7] Doc. 35 at 299-300.

As an ATC, plaintiff's regular schedule included working Friday and Saturday shifts, which tend to be the most difficult days for the FAA to ensure adequate staffing. Plaintiff had an extensive history of taking leave on those days. Following the birth of his son on November 5, 2013, plaintiff continued to ask for and receive leave on Fridays and Saturdays. At 5:30 p.m. on April 11, 2014, plaintiff told his FLM, Joshua Brinegar, that he would be leaving in an hour, taking FMLA leave. Doc. 35 at 209-10. Brinegar explained that he did not have enough staff on duty to allow plaintiff to leave at that time. He also told plaintiff that he needed to submit such requests in writing, in advance,

---

[7] Calling ATCs to work at the last minute is complicated by restrictions on the number of hours and timing of shifts they can work. Doc. 35 at 300. Fridays and Saturdays are the most difficult days to accommodate leave requests and ensure adequate staffing. Id. at 211.

with proper support.[8] Later that evening, plaintiff gave Brinegar a one-page document requesting standing leave every Friday evening and every Saturday through the beginning of November 2014 as "reasonable accommodation" due to the recent birth of his child. Brinegar allowed plaintiff to leave one hour and fifteen minutes before his shift ended. Id. at 210-11.

Plaintiff's request for "reasonable accommodation" raised concerns, as that is language ordinarily used in the case of disability.[9] The following day, Brinegar responded, asking plaintiff to submit any and all documentation that would support his requests for FMLA leave and a reasonable accommodation. The Friday-Saturday combination of leave presented a problem for defendant as schedules are prepared four to six weeks in advance. Doc. 35 at 211-12. Because of Brinegar's concerns, he consulted his superiors, OM, Michelle Schofield, and air traffic manager ("ATM"), Andi Ramaker. Doc. 35 at 212.

At the time Ramaker was ATM, there were more than 400 employees in ZFW. Her most important concern was safety of the

---

[8] In January 2014, the air traffic manager noted that FLMs had been taking a lackadaisical approach to FMLA leave and had instructed them to make sure that such requests were properly documented. Doc. 35 at 291.

[9] "Reasonable accommodation" is a term of art and at the time was a "hot button" issue for FAA. Reasonable accommodations were processed and tracked through the regional Office of Civil Rights, not at the local level. Doc. 35 at 291. Plaintiff's superiors were uncertain what he meant by use of the term in his request. Id.

flying public, but she also had an obligation to taxpayers to accomplish her duties while minimizing unnecessary overtime. Doc. 35 at 290. Ramaker became involved in cases where leave requests were unusual or would cause a significant disruption in the normal flow of staffing, such as requests for extended leave for pregnancies or medical care. Because of the oddity of plaintiff's leave request and its impact on staffing and workload, Ramaker became the ultimate decision-maker. Ramaker asked Schofield to meet with plaintiff to determine exactly what he was demanding. Id. at 291-92.

On April 24, 2014, Schofield met with plaintiff. Doc. 35 at 295. A union representative, Nicholas Daniels, was also present at the meeting. He recalls there being an issue about whether plaintiff could take paid leave instead of leave without pay under Article 26. He advised plaintiff to file a grievance if necessary to obtain requested leave. Doc. 43 at 285. He thought it not "employee friendly" to require plaintiff to fill out paper leave requests. Id. at 283-84. When plaintiff asked why he was being required to submit documents to support his request different from female employees, Schofield responded that "women are different," and explaining that they need time to recover from child birth. Id. at 290.

On April 25, 2014, plaintiff submitted a new written request for leave. Doc. 35 at 219. That request appeared to assert that he needed leave under Article 30 of the CBA because of his wife's medical issues and return to work, but did not include the usual paperwork in support. And, because the forms submitted with the request were filled out incorrectly, Brinegar denied leave. Id. at 212. Ramaker again instructed Schofield to meet with plaintiff. Id. at 292. She did so on April 30, 2014, and requested plaintiff to provide in the remarks section of his leave request form the article and section that applied to his leave request. Id. at 297. On May 1, 2014, plaintiff submitted new leave forms. Brinegar awaited his supervisors' guidance, believing it was not appropriate for him to make the call given the impact granting leave would have on defendant's operations. Id. at 212. Brinegar, Kevin Lagaly, who took over as OM in May or early June 2014, and Ramaker understood that plaintiff was seeking leave under Article 30. Id. at 212, 300, 292.

At Ramaker's direction, Lagaly asked Brinegar to research the matter and provide a recommendation as to how to address plaintiff's pending requests. Doc. 35 at 300-01. On June 1, 2014, Brinegar provided a recommendation for granting leave under Article 26 even though he did not believe plaintiff had requested leave under that provision. Id. at 301, 212, 284. Lagaly

12

discussed the recommendation with Ramaker, then instructed Brinegar to ask plaintiff if he would change the requests to seek leave under Article 26. Id. at 301. Plaintiff declined to do so, and, on direction of Lagaly (who had consulted with Ramaker), Brinegar denied the requests. Id. at 212, 301. On June 8, 2014, plaintiff filed a grievance to complain about the delay in processing his leave requests. Doc. 35 at 288-89. (All of plaintiff's leave requests sought to use sick leave, not annual leave. Under Article 25 of the collective bargaining agreement, there is not a time deadline for ruling on requests to use sick leave.[10] Id. at 212, 39-42.) By separate letter dated June 8, 2014, plaintiff requested leave under Article 26, Section 5. Id. at 190. On June 13, 2014, pursuant to Ramaker's direction, the leave requests were granted. Id. at 292-93, 170-89.

During the period that the global leave requests were pending, plaintiff was able to submit spot leave requests and requests to change the time of his Friday shift. Id. at 213, 50.

V.

Analysis

To prevail on his Title VII claims, plaintiff must show that he suffered an adverse employment action. Bryan v. McKinsey &

---

[10] Article 24, on the other hand, sets a deadline for approval of annual leave requests. Doc. 35 at 37.

13

Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004). An "adverse employment action" is an employment decision that affects the terms and conditions of employment in an ultimate sense. Thompson, 764 F.3d at 503. In other words, it does not include every decision by an employer that arguably might have some tangential effect upon those ultimate decisions. Burger v. Central Apartment Mgmt., Inc., 168 F.3d 875, 878 (5th Cir. 1999). For example, putting an employee on a performance improvement plan is not an adverse employment action. Cannon v. St. Paul Fire & Marine Ins. Co., No. 3:03-CV-2911-N, 2005 WL 1107372, at *3 (N.D. Tex. May 6, 2005). Likewise here, denying leave where proper information was not provided (requesting leave under the wrong provision or refusing to provide supporting documentation)[11] does not amount to an adverse employment action. This is especially so since the blanket leave request was ultimately granted in a very short period of time.

In this case, plaintiff cannot show that denial of leave was substantial.[12] Rather, some of the instances he cites are petty,

---

[11]Plaintiff himself recognizes that he refused to provide requested information. He told defendant he would have to consult his father (an attorney) before deciding what to provide. Then, the next day, when told again what information was required, he stated "that's not gonna happen, you guys are going down." Doc. 43 at 207. Plaintiff believed he was being given the runaround. Doc. 43 at 291.

[12]The court has spent considerable time trying to verify plaintiff's allegations regarding the times he was denied leave. Plaintiff did not highlight his appendix, making the chore very difficult. And, the pages cited do not support his contentions.

14

e.g. denials of one hour of leave or less. In the grand scheme of things, the record reflects that plaintiff's blanket requests for leave to cover Fridays and Saturdays in 2014 were initially denied, but he was allowed to seek leave for individual days, which is basically what he had been doing all along. Further, defendant allowed plaintiff to work an earlier shift on some Fridays. Scheduling decisions do not equate to ultimate employment actions. See Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001); Lewis v. LSG Sky Chefs, No. 3:14-CV-3107-M, 2015 WL 935125, at *5 (N.D. Tex. Mar. 4, 2015); Paniagua v. Tx. Dep't of Criminal Justice, No. 3:99-CV-2681-L, 2001 WL 540908, at *6 (N.D. Tex. May 18, 2001). Plaintiff has not shown that he suffered an adverse employment action.

VI.

Order

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted, and plaintiff take nothing on his claims in this action.

SIGNED November 12, 2018.

_____
JOHN McBRYDE
United States District Judge